Andrew G. Gunem (No. 354042)
Carly M. Roman (No. 349895)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
2261 Market Street, Ste 22946
San Francisco, California 94114
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
agunem@straussborrelli.com
croman@straussborrelli.com

*Attorneys for Plaintiff and Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE UNITED EDUCATION INSTITUTE D/B/A UEI COLLEGE DATA BREACH LITIGATION**<br><br>This Document Relates To: All Action | Master File No. 8:26-cv-01448<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT** |

Jazmine Herrera, Rasheen Campbell, Phylicia Norris, Sharona Perkins, Josh Calderon, and Melissa Turqueza ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant IEC Corporation d/b/a International Education Corporation and UEI College ("UEI College" or "Defendant"). Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a private career college that specializes in short-term vocational and technical training, with campuses in California, Arizona, Nevada, Georgia, Texas, New Mexico, and Washington.[1]

3. As such, Defendant stores a litany of highly sensitive personally identifiable information about its students, including, upon information and belief, names, addresses, dates of birth, Social Security numbers, driver's license numbers, financial information, bank account information, payment card information, and other sensitive information including medical information ("Private Information"). Unfortunately, on or around May 30, 2026, Defendant lost control over that Private Information when the notorious ransomware group, Termite, infiltrated its insufficiently protected computer systems and ***stole*** Plaintiffs' and Class Members' Private Information in a data breach (the "Data Breach").[2]

4. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the Data Breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its students' Private Information.

[1] *About Us*, UEI COLLEGE, https://www.uei.edu/about-us// (last visited August 20, 2026).
[2] https://www.dexpose.io/ransomware-group-termite-compromises-uei-college/ (last visited August 20, 2026)

5. On information and belief, cybercriminals were able to breach Defendant's systems and acquire Plaintiffs' and Class Members' Private Information because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information. In short, Defendant's failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

6. Defendant could have prevented this Data Breach by implementing reasonable, expected, and industry standard data security measures. Instead, Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement these measures to safeguard Plaintiffs' and Class Members' Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendant's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely,

7. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

8. On information and belief, Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves and all others harmed by Defendant's misconduct.

9. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this Data Breach, its students' Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and not secure.

## PARTIES

10. Plaintiff, Jazmine Herrera, is a natural person and a citizen of Bakersfield, California. She is domiciled in California (where she intends to remain).

11. Plaintiff, Rasheen Campbell, is a natural person and a citizen of Winnetka, California. She is domiciled in California (where she intends to remain).

12. Plaintiff, Phylicia Norris, is a natural person and a citizen of Texas. She is domiciled in Texas (where she intends to remain).

13. Plaintiff, Sharona Perkins, is a natural person and a citizen of Highland, California. She is domiciled in California (where she intends to remain).

14. Plaintiff, Josh Calderon, is a natural person and a citizen of Black Canyon City, Arizona. He is domiciled in Arizona (where he intends to remain).

15. Plaintiff, Melissa Turqueza, is a natural person and a citizen of Las Vegas, Nevada. She is domiciled in Nevada (where she intends to remain).

16. Defendant, IEC Corporation d/b/a International Education Corporation and UEI College, is a corporation incorporated in Delaware, with its principal place of business at 16485 Laguna Canyon Road, Suite 300, Irvine, CA 92618.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy

exceeds $5 million, exclusive of interest and costs. Defendant and at least one class member of the putative class are citizens of different states. And there are over 100 putative Class Members.

18. This Court has personal jurisdiction over Defendant because Defendant has its principal place of business and/or corporate headquarters in California. Furthermore, Defendant regularly conducts business in California and has sufficient minimum contacts in California.

19. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

***Defendant Collected and Stored the Private Information of Plaintiffs and the Class***

20. Defendant is a for-profit, private career college that specializes in short-term vocational and technical training, in fields such as healthcare and trades.[3] Defendant operates campuses in California, Arizona, Nevada, Georgia, Texas, New Mexico, and Washington.[4]

21. As part of its business, Defendant receives and maintains the Private Information of thousands of its students.

22. In collecting and maintaining the Private Information, Defendant agreed it would safeguard the data in accordance with its internal policies, state law,

---

[3] *See id.*

[4] *Our Campuses,* UEI COLLEGE, https://www.uei.edu/trade-school/ (last visited August 20, 2026).

and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their Private Information.

23. Indeed, Defendant's Privacy Policy states, "[w]e disclose your Personal Information to third parties only in the ways that are described in this Policy and with our business partners, suppliers and sub-contractors in order to provide you with our Services and perform any contract we enter into with them or you."[5] Disclosure of students' Private Information to cybercriminals is not described in Defendant's Privacy Policy.

24. Under state and federal law, businesses like Defendant have duties to protect their students' Private Information and to notify them about breaches.

[5] *UEI College and United Education Institute Privacy Policy,* UEI COLLEGE, https://www.uei.edu/privacy-policy-terms/ (last visited August 20, 2026).

***Defendant's Data Breach***

25. On or around May 30, 2026, various cybersecurity journalists and other organizations that monitor dark web activity reported that the cybercriminal group known as "Termite" announced that it had hacked Defendant.[6, 7]




26. Termite's post[8] displays Defendant's name, logo, and a description of Defendant's college.[9]

[6] *UEI College*, RANSOMWARE.LIVE, https://www.ransomware.live/id/VUVJIENvbGxlZ2VAdGVybWl0ZQ (last August 20, 2026).
[7] FalconFeeds.io (@FalconFeeds.io) *Ransomware Alert*, X (May 28, 2026 10:24 PM), https://x.com/FalconFeedsio/status/2060200581709594820.
[8] The dark web screenshot was obtained from Ransomware.Live, a website providing real-time ransomware intelligence. *See UEI College*, n. 3, *supra*.
[9] *Id*.

27. Worryingly, Termite's post also displays screenshots of what appears to be Defendant's students' highly sensitive Private Information, including an unredacted passport.[10]

28. Thus, on information and belief, Termite hacked Defendant, stole sensitive Private Information belonging to its students, and has already – or will imminently – post the stolen data on the dark web.

29. According to AttackIQ, a cybersecurity firm, Termite is a ransomware group that conducts highly targeted activities, typically initiated through phishing attacks, compromised websites, or the exploitation of software vulnerabilities to acquire initial access to victim environments.[11] Once a foothold is established, Termite employs double extortion tactics by combining data exfiltration with file encryption to maximize pressure on victims by threatening both operational downtime and data exposure.[12]

30. A ransomware attack is a type of cyberattack that is frequently used to target companies due to the sensitive data they maintain.[13] Companies should treat ransomware attacks as any other data breach incident because ransomware attacks

---

[10] *Id.*

[11] Francis Guibernau*, Emulating the Infestive Termite Ransomware,* ATTACKIQ (May 8, 2025), https://www.attackiq.com/2025/05/08/emulating-termite-ransomware/.

[12] *Id.*

[13] *Ransomware warning: Now attacks are stealing data as well as encrypting it*, available at https://www.zdnet.com/article/ransomware-warning-now-attacks-are-stealing-data-as-well-as-encrypting-it/

don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[14]

31. An increasingly prevalent form of ransomware attack is the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained within.[15] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[16] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[17]

32. As explained by the global cybersecurity firm BlackFog, the modus operandi of ransomware cybercriminals is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[18]

33. Defendant has made no public statements regarding Termite or whether it paid a ransom demand.

---

[14] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

[15] *The chance of data being stolen in a ransomware attack is greater than one in ten*, available at https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/

[16] *Id.*

[17] *Id.*

[18] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BLACKFOG (Jul. 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

34. However, even if Defendant made a ransom payment, there is no guarantee that the data Termite stole will be deleted.[19]

35. The stolen Private Information is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[20]

36. Cybercriminal groups can therefore monetize stolen Private Information and sell it on the dark web as part of a full identity profile.[21] Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[22]

37. As is evident, Defendant cannot and has not denied that Plaintiffs' and Class Members' Private Information was stolen in the Data Breach .

38. Worse still, Defendant has yet to provide direct written notice to Plaintiffs and Class Members that their Private Information was taken without authorization, leaving them unaware of the need to take prompt action to protect themselves from further harm.

39. Because their Private Information was stolen, at least one Plaintiff has suffered actual misuse of their Private Information, and Defendant has failed to

---

[19] *Steve Adler, Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack,* HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[20] *Id.*
[21] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion*?, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (listed visited August 20, 2026).
[22] *Id.*

provide proper and timely notice, Plaintiffs and Class Members are, and will remain, at an imminent risk that their data will be illegally misused and in the future.

40. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[23]

41. Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

42. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[23] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

***Plaintiff Herrera's Experience with the Data Breach***

43. Plaintiff Jazmine Herrera is a former student of Defendant who resides in Bakersfield, California. Plaintiff Herrera attended UEI College from on or around 2025 to on or around 2026.

44. As a condition of her enrollment with Defendant, Plaintiff Herrera was required to provide Defendant with her Private Information, including at least her date of birth, driver's license, Social Security number, full name, and financial information. Defendant obtained and maintained Plaintiff Herrera's Private Information in its systems.

45. Plaintiff Herrera is very careful about sharing her sensitive Private Information. She stores any documents containing her Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

46. Plaintiff Herrera provided her Private Information to Defendant and trusted Defendant would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law.

47. Upon information and belief, Plaintiff Herrera's Private Information was subject to Defendant's Data Breach. Defendant has never directly notified Plaintiff that her Private Information was improperly accessed and obtained by unauthorized third parties, nor has Defendant provided Plaintiff with any guidance regarding steps she should take to protect herself as a result of the Data Breach. Upon information and belief, Plaintiff Herrera's highly sensitive Private Information was exposed in the Data Breach.

48. As a result of the Data Breach, Plaintiff Herrera made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.

49. Plaintiff Herrera has spent significant time dealing with the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work or recreation. Plaintiff Herrera anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

50. Plaintiff Herrera suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her Private Information; and (d) present, imminent, and impending injury arising from the increased risk of identity theft and fraud.

51. As a result of the Data Breach, Plaintiff Herrera has also suffered emotional distress arising from the release of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff Herrera is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

52. Plaintiff Herrera suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals. Indeed, at least one Plaintiff has already experienced actual misuse of their Private Information as a result of the Data Breach. Thus, Plaintiff Herrera, all Plaintiffs, and the entire Class, are at a significant risk of imminent harm. Plaintiff Herrera also faces a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of her Private Information, since potential fraudsters can use the compromised Private Information to carry out such targeted schemes against Plaintiff Herrera.

53. As a result of the Data Breach, Plaintiff Herrera additionally suffered actual injury in the form of an increase in unwanted spam, scam, and phishing phone calls and text messages following the Data Breach. Upon information and belief, these unwanted communications are evidence that Plaintiff Herrera's Private Information is now available for exploitation by cybercriminals.

54. Plaintiff Herrera also suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Herrera entrusted to Defendant for the purpose of receiving educational services from Defendant and which was compromised in, and as a result of, the Data Breach.

55. Plaintiff Herrera also lost the benefit of the bargain she made with Defendant. Plaintiff Herrera overpaid for services that were intended to be

accompanied by adequate data security but were not. Thus, Plaintiff Herrera did not get what she bargained for.

56. Plaintiff Herrera has a continuing interest in ensuring that her Private Information, which remains in Defendant's possession, is protected and safeguarded from future breaches. Defendant's conduct resulted in the unauthorized disclosure of Plaintiff Herrera's Private Information to cybercriminals. The unauthorized disclosure of her Private Information constitutes an invasion of a legally protected privacy interest that is traceable to Defendant's failure to adequately secure the Private Information in its custody, and has resulted in actual, particularized, and concrete harm to her. Defendant's conduct, as evidenced by the circumstances of the Data Breach, creates an imminent risk of future identity theft, fraud, and other forms of exploitation.

***Plaintiff Campbell's Experience with the Data Breach***

57. Plaintiff Rasheen Campbell is a former student of Defendant who resides in Winnetka, California. Plaintiff Campbell attended the Huntington Park campus in 2018 and the Encino campus in 2019.

58. As a condition of her enrollment with Defendant, Plaintiff Campbell was required to provide Defendant with her Private Information, including at least her name, address, date of birth, Social Security number, driver's license number, financial information, bank account information, payment card information, and other sensitive information including medical information. Defendant obtained and maintained Plaintiff Campbell's Private Information in its systems.

59. Plaintiff Campbell is very careful about sharing her sensitive Private Information. She stores any documents containing her Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

60. Plaintiff Campbell provided her Private Information to Defendant and trusted Defendant would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law.

61. Upon information and belief, Plaintiff Campbell's Private Information was subject to Defendant's Data Breach. Defendant has never directly notified Plaintiff that her Private Information was improperly accessed and obtained by unauthorized third parties, nor has Defendant provided Plaintiff with any guidance regarding steps she should take to protect herself as a result of the Data Breach. Upon information and belief, Plaintiff Campbell's highly sensitive Private Information was exposed in the Data Breach.

62. As a result of the Data Breach, Plaintiff Campbell made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, investigating suspicious activity, and changing her phone number and creating a new email account as a result of the increase in spam.

63. Plaintiff Campbell has spent significant time dealing with the Data Breach—at least four to five hours of her valuable time that she otherwise would have spent on other activities, including but not limited to work or recreation. Additionally, Plaintiff Campbell anticipates spending considerable time and money

on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

64. Plaintiff Campbell suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her Private Information; and (d) present, imminent, and impending injury arising from the increased risk of identity theft and fraud.

65. Plaintiff Campbell suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals. Indeed, at least one Plaintiff has already experienced actual misuse of their Private Information as a result of the Data Breach. Thus, Plaintiff Campbell, all Plaintiffs, and the entire Class, are at a significant risk of imminent harm. Plaintiff Campbell also faces a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of her Private Information, since potential fraudsters can use the compromised Private Information to carry out such targeted schemes against Plaintiff Campbell.

66. As a result of the Data Breach, Plaintiff Campbell additionally suffered actual injury in the form of an increase in unwanted spam, scam, and phishing phone calls and text messages following the Data Breach. Upon information and belief, these unwanted communications are evidence that Plaintiff Campbell's Private Information is now available for exploitation by cybercriminals.

67. As a result of this dramatic uptick in spam calls, emails, and texts, Plaintiff Campbell has changed her phone number and created a new email account.

68. Plaintiff Campbell also suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Campbell entrusted to Defendant for the purpose of receiving educational services from Defendant and which was compromised in, and as a result of, the Data Breach.

69. Plaintiff Campbell also lost the benefit of the bargain she made with Defendant. Plaintiff Campbell paid thousands of dollars in tuition for educational services that she reasonably expected would be accompanied by adequate data security and protection of her personal information. That tuition included amounts Plaintiff Campbell paid out of pocket and amounts financed through student loans. Because Defendant failed to provide the data security it represented or was obligated to provide, Plaintiff Campbell did not receive the full benefit of the services for which she paid.

70. Plaintiff Campbell has a continuing interest in ensuring that her Private Information, which remains in Defendant's possession, is protected and safeguarded from future breaches. Defendant's conduct resulted in the unauthorized disclosure of Plaintiff Campbell's Private Information to cybercriminals. The unauthorized disclosure of her Private Information constitutes an invasion of a legally protected privacy interest that is traceable to Defendant's failure to adequately secure the Private Information in its custody, and has resulted in actual, particularized, and concrete harm to her. Defendant's conduct, as evidenced by the circumstances of the

Data Breach, creates an imminent risk of future identity theft, fraud, and other forms of exploitation.

***Plaintiff Norris's Experience with the Data Breach***

71. Plaintiff Phylicia Norris is a former student of Defendant who resides in Texas.

72. As a condition of her enrollment with Defendant, Plaintiff Norris was required to provide Defendant with her Private Information, including at least her name, address, date of birth, driver's license, Social Security number, and other sensitive data. Defendant obtained and maintained Plaintiff Norris's Private Information in its systems.

73. Plaintiff Norris is very careful about sharing her sensitive Private Information. She stores any documents containing her Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

74. Plaintiff Norris provided her Private Information to Defendant and trusted Defendant would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law.

75. Upon information and belief, Plaintiff Norris's Private Information was subject to Defendant's Data Breach. Plaintiff Norris first learned of the Data Breach after reading articles online. Defendant has never directly notified Plaintiff that her Private Information was improperly accessed and obtained by unauthorized third parties, nor has Defendant provided Plaintiff with any guidance regarding steps she should take to protect herself as a result of the Data Breach. Upon information and

belief, Plaintiff Norris's highly sensitive Private Information was exposed in the Data Breach.

76. As a result of the Data Breach, Plaintiff Norris made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports, and financial account statements for any indications of actual or attempted identity theft or fraud.

77. Plaintiff Norris has spent significant time dealing with the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work or recreation. Plaintiff Norris anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

78. Plaintiff Norris suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her Private Information; and (d) present, imminent, and impending injury arising from the increased risk of identity theft and fraud.

79. As a result of the Data Breach, Plaintiff Norris has also suffered emotional distress arising from the release of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff Norris is very

concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

80. Plaintiff Norris suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals. Indeed, at least one Plaintiff has already experienced actual misuse of their Private Information as a result of the Data Breach. Thus, Plaintiff Norris, all Plaintiffs, and the entire Class, are at a significant risk of imminent harm. Plaintiff Norris also faces a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of her Private Information, since potential fraudsters can use the compromised Private Information to carry out such targeted schemes against Plaintiff Norris.

81. Plaintiff Norris also suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Norris entrusted to Defendant for the purpose of receiving educational services from Defendant and which was compromised in, and as a result of, the Data Breach.

82. Plaintiff Norris also lost the benefit of the bargain she made with Defendant. Plaintiff Norris overpaid for services that were intended to be accompanied by adequate data security but were not. Thus, Plaintiff Norris did not get what she bargained for.

83. Plaintiff Norris has a continuing interest in ensuring that her Private Information, which remains in Defendant's possession, is protected and safeguarded

from future breaches. Defendant's conduct resulted in the unauthorized disclosure of Plaintiff Norris's Private Information to cybercriminals. The unauthorized disclosure of her Private Information constitutes an invasion of a legally protected privacy interest that is traceable to Defendant's failure to adequately secure the Private Information in its custody, and has resulted in actual, particularized, and concrete harm to her. Defendant's conduct, as evidenced by the circumstances of the Data Breach, creates an imminent risk of future identity theft, fraud, and other forms of exploitation.

***Plaintiff Perkins's Experience with the Data Breach***

84. Plaintiff Sharona Perkins is a current student of Defendant who resides in Highland, California. Plaintiff Perkins attended the Riverside campus in 2026.

85. As a condition of her enrollment with Defendant, Plaintiff Perkins was required to provide Defendant with her Private Information, including at least her name, address, date of birth, Social Security number, driver's license number, financial information, bank account information, payment card information, and other sensitive information, including medical information. Defendant obtained and maintained Plaintiff Perkins's Private Information in its systems.

86. Plaintiff Perkins is very careful about sharing her sensitive Private Information. She stores any documents containing her Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

87. Plaintiff Perkins provided her Private Information to Defendant and trusted Defendant would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law.

88. Upon information and belief, Plaintiff Perkins's Private Information was subject to Defendant's Data Breach. Plaintiff Perkins first learned of the Data Breach after reading articles online. Defendant has never directly notified Plaintiff that her Private Information was improperly accessed and obtained by unauthorized third parties, nor has Defendant provided Plaintiff with any guidance regarding steps she should take to protect herself as a result of the Data Breach. Upon information and belief, Plaintiff Perkins's highly sensitive Private Information was exposed in the Data Breach.

89. As a result of the Data Breach, Plaintiff Perkins made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, contacting UEI about the Data Breach, contacting the bank about fraudulent activity and to get new credit and debit cards issued, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.

90. Plaintiff Perkins has spent significant time dealing with the Data Breach—at least two hours of her valuable time *per day* that she otherwise would have spent on other activities, including but not limited to work or recreation. Additionally, Plaintiff Perkins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

91. Plaintiff Perkins suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her Private Information; and (d) present, imminent, and impending injury arising from the increased risk of identity theft and fraud.

92. As a result of the Data Breach, Plaintiff Perkins has also suffered emotional distress arising from the release of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff Perkins is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

93. Plaintiff Perkins suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals. Indeed, as discussed below, Plaintiff Perkins has already experienced actual misuse of her Private Information as a result of the Data Breach. Thus, Plaintiff Perkins, all Plaintiffs, and the entire Class, are at a significant risk of imminent harm. Plaintiff Perkins also faces a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of her Private Information, since potential fraudsters can use the compromised Private Information to carry out such targeted schemes against Plaintiff Perkins.

94. Plaintiff Perkins has also suffered actual financial harm from the misuse of her Private Information following the Data Breach. In late May 2026 and again in late June 2026, Plaintiff Perkins experienced fraudulent charges on her Chase credit card, the same credit card she used to make her payment to UEI. Although Chase recognized the charges as fraudulent, it did not reimburse Plaintiff Perkins for the resulting charges. Plaintiff Perkins was also required to contact Chase and obtain replacement account numbers, including a new debit card and a new credit card, to protect against further fraudulent activity. These incidents caused Plaintiff Perkins financial losses and required her to spend significant time addressing and investigating the fraud.

95. Plaintiff Perkins has also experienced attempted fraudulent access to her accounts. At the end of July 2026, Plaintiff Perkins experienced an unauthorized attempt to access her email account originating from a non-California location. This attempted account intrusion further demonstrates that Plaintiff Perkins's Private Information is being targeted and used in efforts to gain unauthorized access to her accounts.

96. As a result of the Data Breach, Plaintiff Perkins additionally suffered actual injury in the form of an increase in unwanted spam, scam, and phishing phone calls, emails, and text messages following the Data Breach. Plaintiff Perkins currently receives approximately ten to twelve such unwanted calls each day, an exponential increase from the volume she received before the Data Breach.

97. On multiple occasions, Plaintiff Perkins has received phishing communications in which the sender accurately referenced the last four digits of her

Social Security number and attempted to induce her to disclose the remaining digits. She has also received communications in which the sender accurately stated her home address and date of birth and attempted to induce her to confirm that information. Upon information and belief, these unwanted communications are evidence that Plaintiff Perkins's Private Information is now available for exploitation by cybercriminals.

98. Plaintiff Perkins also suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Perkins entrusted to Defendant for the purpose of receiving educational services from Defendant and which was compromised in, and as a result of, the Data Breach.

99. Plaintiff Perkins also lost the benefit of the bargain she made with Defendant. Plaintiff Perkins paid thousands of dollars in tuition for educational services that she reasonably expected would be accompanied by adequate data security and protection of her personal information. Because Defendant failed to provide the data security it represented or was obligated to provide, Plaintiff Perkins did not receive the full benefit of the services for which she paid.

100. Plaintiff Perkins has a continuing interest in ensuring that her Private Information, which remains in Defendant's possession, is protected and safeguarded from future breaches. Defendant's conduct resulted in the unauthorized disclosure of Plaintiff Perkins's Private Information to cybercriminals. The unauthorized disclosure of her Private Information constitutes an invasion of a legally protected privacy interest that is traceable to Defendant's failure to adequately secure the

Private Information in its custody, and has resulted in actual, particularized, and concrete harm to her. Defendant's conduct, as evidenced by the circumstances of the Data Breach, creates an imminent risk of future identity theft, fraud, and other forms of exploitation.

***Plaintiff Calderon's Experience with the Data Breach***

101. Plaintiff Josh Calderon is a former student of Defendant who resides in Black Canyon City, Arizona.

102. As a condition of his enrollment at Defendant's college, Plaintiff Calderon provided Defendant with his Private Information, including his name, Social Security number, and health information. Defendant obtained and maintained Plaintiff Calderon's Private Information in its systems.

103. Plaintiff Calderon is very careful about sharing his sensitive Private Information. He stores any documents containing his Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Calderon provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law.

104. Upon information and belief, Plaintiff Calderon's Private Information was subject to Defendant's Data Breach. Plaintiff Calderon first learned of the Data Breach from media reports. Defendant has never directly notified Plaintiff Calderon that his Private Information was improperly accessed and obtained by unauthorized third parties, nor has Defendant provided Plaintiff Calderon with any guidance

regarding steps he should take to protect himself as a result of the Data Breach. Upon information and belief, Plaintiff Calderon's highly sensitive Private Information was exposed in the Data Breach.

105. As a result of the Data Breach, Plaintiff Calderon made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to verifying his financial statements, changing passwords on his various online accounts, and researching the potential consequences of the Data Breach.

106. Plaintiff Calderon has spent significant time dealing with the Data Breach—at least five hours of his valuable time that he otherwise would have spent on other activities, including but not limited to work or recreation. Plaintiff Calderon anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

107. Plaintiff Calderon suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of his privacy rights; (c) the theft of his Private Information; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

108. As a result of the Data Breach, Plaintiff Calderon has also suffered emotional distress arising from the release of his Private Information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud. Plaintiff Calderon is very

concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

109. Plaintiff Calderon suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals. Indeed, at least one Plaintiff has already experienced actual misuse of their Private Information as a result of the Data Breach. Thus, Plaintiff Calderon, all Plaintiffs, and the entire Class, are at a significant risk of imminent harm. Plaintiff Calderon also faces a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of his Private Information, since potential fraudsters can use the compromised Private Information to carry out such targeted schemes against Plaintiff Calderon.

110. Plaintiff Calderon also suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff Calderon entrusted to Defendant for the purpose of receiving educational services from Defendant and which was compromised in, and as a result of, the Data Breach.

111. Plaintiff Calderon also lost the benefit of the bargain he made with Defendant. Plaintiff Calderon overpaid for services that were intended to be accompanied by adequate data security but were not. Thus, Plaintiff Calderon did not get what he bargained for.

112. Plaintiff Calderon has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendant, is protected and

safeguarded from future breaches. Defendant's conduct resulted in the unauthorized disclosure of Plaintiff Calderon's Private Information to cybercriminals. The unauthorized disclosure of his Private Information constitutes an invasion of a legally protected privacy interest that is traceable to Defendant's failure to adequately secure the Private Information in its custody, and has resulted in actual, particularized, and concrete harm to him. Defendant's conduct, as evidenced by the circumstances of the Data Breach, creates an imminent risk of future identity theft, fraud, or other forms of exploitation.

***Plaintiff Turqueza's Experience with the Data Breach***

113. Plaintiff Melissa Turqueza is a former employee of Defendant who resides in Las Vegas, Nevada. She taught multiple courses at Defendant's Las Vegas campus from approximately September 2020 to March 2022.

114. As a condition of her employment with Defendant, Plaintiff Turqueza provided Defendant with her Private Information, including her full name, address, date of birth, Social Security Number, financial information, bank account information, payment card information, number of members of her household, driver's license number, tax documents, health insurance information, medical information, and other sensitive private information. Defendant obtained and maintained Plaintiff Turqueza's Private Information in its systems.

115. Plaintiff Turqueza is very careful about sharing her sensitive Private Information. She stores any documents containing her Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff

Turqueza provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law.

116. Upon information and belief, Plaintiff Turqueza's Private Information was subject to Defendant's Data Breach. Plaintiff Turqueza first learned of the Data Breach through third-party cybersecurity and ransomware tracking websites reporting that Defendant had suffered a cyberattack resulting in the exfiltration of sensitive personal data. Defendant has never directly notified Plaintiff Turqueza that her Private Information was improperly accessed and obtained by unauthorized third parties, nor has Defendant provided Plaintiff Turqueza with any guidance regarding steps she should take to protect herself as a result of the Data Breach. Upon information and belief, Plaintiff Turqueza's highly sensitive Private Information was exposed in the Data Breach.

117. As a result of the Data Breach, Plaintiff Turqueza made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, contacting the major credit bureaus to request a freeze, monitoring accounts for suspicious activity, investigating fraudulent and/or suspicious activity, and changing her username and password with her financial institution alongside all other applications she utilizes.

118. Plaintiff Turqueza has spent significant time dealing with the Data Breach—at least three hours of her valuable time *per week* that she otherwise would have spent on other activities, including but not limited to work or recreation.

Plaintiff Turqueza anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

119. Plaintiff Turqueza suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her Private Information; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

120. As a result of the Data Breach, Plaintiff Turqueza has also suffered emotional distress arising from the release of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety and stress about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff Turqueza is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

121. Plaintiff Turqueza suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals. Indeed, Plaintiff Turqueza has already suffered actual misuse of her Private Information as a result of the Data Breach. Thus, Plaintiff Turqueza, all Plaintiffs, and the entire Class, are at a significant risk of imminent harm. Plaintiff Turqueza also faces a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of her Private Information, since potential fraudsters can use the

compromised Private Information to carry out such targeted schemes against Plaintiff Turqueza. Following the Data Breach, Plaintiff Turqueza received alerts from Experian and Credit Karma indicating that her Private Information had been located on the Dark Web. In response, Plaintiff Turqueza began monitoring her financial account statements and obtained and reviewed her credit report through Credit Karma. Additionally, on June 19, 2026, Plaintiff Turqueza received an alert from Facebook notifying her of an unusual attempt to access her account.

122. As a result of the Data Breach, Plaintiff Turqueza additionally suffered actual injury in the form of a dramatic increase in unwanted spam and phishing calls concerning purported loan approvals, credit inquiries, and health insurance offers. Upon information and belief, these communications were caused by the Data Breach based on their proximity in time to the Data Breach.

123. Plaintiff Turqueza also suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Turqueza entrusted to Defendant for the purpose of receiving employment from Defendant and which was compromised in, and as a result of, the Data Breach.

124. Plaintiff Turqueza also lost the benefit of the bargain she made with Defendant. Plaintiff Turqueza accepted lower compensation for her employment services, because she assumed that her employer would provide adequate data security, which it failed to do. Had she known Defendant was careless with her private information, Plaintiff Turqueza would have demanded higher wages. Thus, Plaintiff Turqueza did not get what she bargained for.

125. Plaintiff Turqueza has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. Defendant's conduct resulted in the unauthorized disclosure of Plaintiff Turqueza's Private Information to cybercriminals. The unauthorized disclosure of her Private Information constitutes an invasion of a legally protected privacy interest that is traceable to Defendant's failure to adequately secure the Private Information in its custody, and has resulted in actual, particularized, and concrete harm to her. Defendant's conduct, as evidenced by the circumstances of the Data Breach, creates an imminent risk of future identity theft, fraud, or other forms of exploitation.

***Consumers Prioritize Data Security***

126. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[24] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[25]

---

[24] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited August 20, 2026).
[25] *Id*. at 3.

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[26]

c. 89% of consumers stated that "I care about data privacy."[27]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[28]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[29]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[30]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

127. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, theft of their Private Information, multiple instances of identity theft, publication of their Private Information to the dark web, fraudulent charges to their financial accounts, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. additional instances of actual misuse of their Private Information;

---

[26] *Id.*
[27] *Id.* at 9.
[28] *Id.*
[29] *Id.*
[30] *Id.* at 11.

b. loss of the opportunity to control how their Private Information is used;

c. diminution in value of their Private Information;

d. compromise and continuing publication of their Private Information;

e. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

f. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

g. delay in receipt of tax refund monies;

h. unauthorized use of their stolen Private Information; and

i. continued risk to their Private Information —which was stolen in the Data Breach and remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

***Substantially Increased Risk of Identity Theft and Fraud***

128. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because: (i) their Private Information was stolen in the Data Breach by the ransomware group, Termite; (ii) the Private Information stolen in the Data Breach includes Plaintiffs' and Class Members' Social Security numbers; and (iii)

multiple Plaintiffs have suffered actual misuse of their Private Information as a result of the Data Breach.

129. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

130. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

131. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

132. The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[31] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the

---

[31] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited August 20, 2026).

website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[32] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

133. The unencrypted Private Information of Plaintiffs and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access Plaintiffs' and Class Members' Private Information.

134. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[33] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[34] As data breaches continue to reveal, "PII about employees, clients and the public are housed in all kinds of organizations,

---

[32] *Id.*

[33] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/

[34] Id.

and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[35]

135. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

136. In particular, the theft of Social Security numbers—in combination with other Private Information (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

137. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[36] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[37]

138. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt

---

[35] Id.

[36] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[37] *Id.*

collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

139. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[38]

140. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market. This fear and realization is particularly true in this case where the ransomware group, Termite, has already confirmed the theft of Plaintiffs' and Class Members' Private Information.

141. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

142. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more

[38] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

143. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[39]

144. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[40] These dossiers are both shockingly accurate and

[39] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited August 20, 2026).

[40] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes,

comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private Information with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

145. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

146. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of

---

including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[41]

147. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to report to Plaintiffs and the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

148. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

149. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

[41] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited August 20, 2026).

150. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

151. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

152. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[42]

153. Furthermore, a study conducted by Quorum Cyber, a provider of Microsoft-focused security solutions, reveals that 2025 saw a significant escalation in cyberattacks against educational institutions worldwide, increasing by 63% between November 2023 and October 2025.[43]

154. Therefore, the increase in such attacks, and attendant risk of future attacks, were widely known to the public and to anyone in Defendant's industry, including Defendant.

---

[42] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[43] Naveen Goud, *Universities and Schools were badly hit by Cyber Attacks in 2025*, CYBERSECURITY INSIDERS (Apr. 23, 2026), https://www.cybersecurity-insiders.com/universities-and-schools-were-badly-hit-by-cyber-attacks-in-2025/,

***Defendant Could Have Prevented the Data Breach***

155. Data breaches are preventable.[44] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[45]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[46]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [47]

***Defendant Failed to Follow FTC Guidelines***

156. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued

---

[44] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[45] *Id.* at 17.
[46] *Id.* at 28.
[47] *Id.*

numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

157. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[48] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

158. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

159. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

[48] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

160. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

161. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its students' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

162. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

163. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as

firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

164. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

165. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

166. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Private Information was compromised in the Defendant's Data Breach.

167. Plaintiffs seek to represent a California Subclass (together with the "Nationwide Class", the "Class") defined as follows:

All California Residents whose Private Information was compromised in the Defendant's Data Breach.

168. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

169. Plaintiffs reserve the right to amend the class definition.

170. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

171. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

172. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 100 members.

173. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

174. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members'

interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

175. <u>Commonality and Predominance</u>. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Private Information;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant were negligent in maintaining, protecting, and securing Private Information;

d. if Defendant breached contract promises to safeguard Plaintiffs' and the Class's Private Information;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and/or injunctive relief.

176. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

177. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

178. Plaintiffs and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

179. Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

180. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if their Private Information was wrongfully disclosed.

181. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' Private Information.

182. Defendant owed to Plaintiffs and Class Members at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

183. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

184. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

185. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

186. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

187. Plaintiffs relied on Defendant to exercise its professional judgement in protecting their Private Information and had no way to audit or verify the integrity of Defendant's data security practices.

188. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

189. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and Class Members' sensitive Private Information.

190. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

191. Similarly, and as described *infra*, Defendant violated its duties under the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq*. (the "CCPA"), the California Customer Records Act, Cal. Civ. Code § 1798.80, *et seq*. (the "CRA"), and other state data security laws which constitutes negligence. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt

to access Defendant's databases containing the Private Information —whether by malware or otherwise.

192. Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

193. Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

194. Defendant breached these duties as evidenced by the Data Breach.

195. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

196. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injuries.

197. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

198. Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

199. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

200. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

201. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

202. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

203. Plaintiffs and Class Members were required to provide their Private Information to Defendant as a condition of receiving educational services provided by Defendant. Plaintiffs and Class Members provided their Private Information to Defendant or its third-party agents in exchange for Defendant's services.

204. Plaintiffs and Class Members reasonably understood that a portion of the funds they paid to Defendant in the form of tuition payments, or the revenue derived from the value of their labor, would be used to pay for adequate cybersecurity measures.

205. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

206. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant or its third-party agents in exchange for services.

207. In turn, and through internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

208. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

209. After all, Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

210. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

211. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

212. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

213. Defendant materially breached the contracts it entered into with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

214. In these and other ways, Defendant violated its duty of good faith and fair dealing.

215. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

216. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

217. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**<u>THIRD CAUSE OF ACTION</u>**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

218. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

219. This claim is pleaded in the alternative to the breach of implied contract claim.

220. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefited from (1) using their Private Information to provide services, and (2) accepting payment for services.

221. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

222. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

223. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

224. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

225. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) Private Information and (2) payment because Defendant failed to adequately protect their Private Information.

226. Plaintiffs and Class Members have no adequate remedy at law.

227. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FOURTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

228. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

229. Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

230. Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq*. (the "CCPA"), the California Customer Records Act, Cal. Civ. Code § 1798.80, *et seq*. (the "CRA"), Section 5 of the FTC Act, and other state data security laws which constitutes negligence.

231. Defendant stored the Private Information of Plaintiffs and the California Subclass in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiffs' and the California Subclass's Private Information secure to prevent the loss or misuse of that Private Information.

232. Defendant failed to disclose to Plaintiffs and the California Subclass that their Private Information was not secure. However, Plaintiffs and the California Subclass were entitled to assume, and did assume, that Defendant had secured their Private Information. At no time were Plaintiffs and the California Subclass on notice that their Private Information was not secure, which Defendant had a duty to disclose.

233. Defendant also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and the California Subclass's nonencrypted and nonredacted Private Information.

234. Had Defendant complied with these requirements, Plaintiffs and the California Subclass would not have suffered the damages related to the Data Breach.

235. Defendant's conduct was unlawful, in that it violated the CCPA.

236. Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

237. Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

238. Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting Private Information.

239. Defendant also engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g*., Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

240. Instead, Defendant made the Private Information of Plaintiffs and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiffs and the California Subclass to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

241. As a result of those unlawful and unfair business practices, Plaintiffs and the California Subclass suffered an injury-in-fact and have lost money or property.

242. Plaintiffs would not have paid for Defendant's services, or would have paid less for them, had they known that Defendant did not adequately fund or implement reasonable data security practices in line with industry standards.

243. For one, on information and belief, Plaintiffs' and the California Subclass's stolen Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

244. The injuries to Plaintiffs and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

245. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

246. Therefore, Plaintiffs and the California Subclass are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

**<u>FIFTH CAUSE OF ACTION</u>**
**Violation of the California Customer Records Act, § 1798 et seq.**
**(On Behalf of Plaintiffs Herrera, Campbell, and Perkins and the California Subclass)**

247. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

248. Plaintiffs bring this count on behalf of the California Subclass. For purposes of this count, Plaintiffs will refer to the California Subclass as the "Class" or "California Subclass".

249. Section 1798.82 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses

computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay . . . ."

250. The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." (Cal. Civ. Code, § 1798.82(b).)

251. Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

a. The security breach notification shall be written in plain language;

b. The security breach notification shall include, at a minimum, the following information:

i. The name and contact information of the reporting person or business subject to this section;

ii. A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

iii. If the information is possible to determine at the time the notice is provided, then any of the following:

1. The date of the breach;
2. The estimated date of the breach; or
3. The date range within which the breach occurred. The notification shall also include the date of the notice.

c. Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

d. A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

e. The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

252. The Data Breach described herein constituted a "breach of the security system" of Defendant.

253. As alleged above, Defendant unreasonably delayed informing Plaintiffs and the California Subclass about the Data Breach, affecting their Private Information, after Defendant knew the Data Breach had occurred. In fact, Plaintiffs have not received a data breach notice to date.

254. Defendant failed to disclose to Plaintiffs and the California Subclass, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Private Information when Defendant knew or reasonably believed such information had been compromised.

255. Defendant's ongoing business interests gave Defendant incentive to conceal the Data Breach from the public to ensure continued revenue.

256. Upon information and belief, no law enforcement agency instructed Defendant that timely notification to Plaintiffs and the California Subclass would impede its investigation.

257. As a result of Defendant's violation of California Civil Code section 1798.82, Plaintiffs and the California Subclass were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiffs and the California Subclass because their stolen information would have had less value to identity thieves.

258. As a result of Defendant's violation of California Civil Code section 1798.82, Plaintiffs and the California Subclass suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

259. Plaintiffs and the California Subclass seek all remedies available under California Civil Code section 1798.84, including, but not limited to the damages

suffered by Plaintiffs and the California Subclass as alleged above and equitable relief.

260. Defendant's misconduct as alleged herein is fraud under California Civil Code section 3294(c)(3) in that it was deceit or concealment of a material fact known to Defendant conducted with the intent on the part of Defendant of depriving Plaintiffs and the California Subclass of "legal rights or otherwise causing injury." In addition, Defendant's misconduct as alleged herein is malice or oppression under California Civil Code section 3294(c)(1) and (c) in that it was despicable conduct carried on by Defendant with a willful and conscious disregard of the rights or safety of Plaintiffs and the California Subclass and despicable conduct that has subjected Plaintiffs and the California Subclass to cruel and unjust hardship in conscious disregard of their rights. As a result, Plaintiffs and the California Subclass are entitled to punitive damages against Defendant under California Civil Code section 3294(a).

## SIXTH CAUSE OF ACTION
**Violations of the California Consumer Privacy Act ("CCPA")**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiffs Herrera, Campbell, and Perkins and the California Subclass)**

261. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

262. Plaintiffs bring this count on behalf of the California Subclass. For purposes of this count, Plaintiffs will refer to the California Subclass as the "Class" or "California Subclass".

263. Defendant violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted Private Information of Plaintiffs and the California Subclass. As a direct and proximate result, Plaintiffs' and the California Subclass's nonencrypted and nonredacted Private Information was subject to unauthorized access and exfiltration, theft, or disclosure.

264. Defendant is a "business" under the meaning of Civil Code § 1798.140 because Defendant is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code § 1798.140(d).

265. Plaintiffs and the California Subclass seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Private Information, including Plaintiffs' and the California Subclass' Private Information. Plaintiffs and the California Subclass have an interest in ensuring that their Private Information is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

266. Pursuant to California Civil Code § 1798.150(b), Plaintiffs Herrera, Perkins and Campbell mailed a CCPA notice letter to Defendant's registered service

agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. If Defendant cannot cure within 30 days—and Plaintiffs believe such cure is not possible under these facts and circumstances—then Plaintiffs intend to promptly amend this Complaint to seek statutory damages as permitted by the CCPA on behalf of Plaintiffs Herrera, Perkins and Campbell.

267. As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

268. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

269. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

270. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described in this Complaint.

271. UEI College owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' Private Information.

272. UEI College still possesses Private Information regarding Plaintiffs and Class Members.

273. Plaintiffs allege that UEI's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

274. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. UEI College owes a legal duty to secure its students' Private Information and to timely notify students of a data breach under the common law and Section 5 of the FTCA;

b. UEI College's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect students' Private Information; and

c. UEI College continues to breach this legal duty by failing to employ reasonable measures to secure students' Private Information.

275. This Court should also issue corresponding prospective injunctive relief requiring UEI to employ adequate security protocols consistent with legal and industry standards to protect students' Private Information, including the following:

a. Order UEI College to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, UEI College must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on UEI College's systems on a periodic basis, and ordering UEI College to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of UEI College's systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps UEI College's students should take to protect themselves.

276. If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at UEI College. The risk of another such breach is real, immediate, and substantial. If another breach at UEI College occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

277. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to UEI College if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of UEI College's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and UEI College has a pre-existing legal obligation to employ such measures.

278. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a

subsequent data breach at UEI College, thus preventing future injury to Plaintiffs and other students whose Private Information would be further compromised.

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Enjoining Defendant from further unfair and/or deceptive practices;

E. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Dated: August 26, 2026

Respectfully submitted,

By: */s/ Carly M. Roman*

Carly M. Roman (SBN 349895)
Andrew G. Gunem (SBN 354042)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
2261 Market St., Suite 22946
San Francisco, CA 94114
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
croman@straussborrelli.com
agunem@straussborrelli.com

Scott Edelsberg
CA Bar No. 330990
scott@edelsberglaw.com
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave, Suite 417
Aventura, FL 33180
Telephone: 786-289-9469

John J. Nelson (SBN 317598)
**MILBERG, PLLC**
280 S. Beverly Drive-Penthouse
Beverly Hills, CA 90212
Tel: (858) 209-6941
jnelson@milberg.com

*Interim Lead Class Counsel*

Tyler J. Bean (admitted *pro hac vice*)
Tanner R. Hilton (admitted *pro hac vice*)
**SIRI & GLIMSTAD LLP**
101 Park Avenue
Suite 1300, #16982799
Oklahoma City, OK 73102
Tel: (212) 532-1091
E: tbean@sirillp.com
E: thilton@sirillp.com

Sean Short (pending *pro hac vice*)
**ELLZEY KHERKHER**
**SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
sshort@eksm.com
service@eksm.com

**CERTIFICATE OF SERVICE**

I, Carly M. Roman, hereby certify that on August 26, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, via the ECF system.

DATED this 26th day of August, 2026.

STRAUSS BORRELLI PLLC

By: *<u>/s/ Carly M. Roman</u>*

Carly M. Roman
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
croman@straussborrelli.com